UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MICHAEL HOOTSTEIN, ET AL.,      )
        Plaintiffs              )
                                )
                v.              )   08-CV-30113-MAP
                                )
JOSEPH COLLINS, ET AL.,         )
        Defendants              )


AMENDED MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
(Dkt. Nos. 51 & 54)

March 8, 2013

PONSOR, U.S.D.J.

I.   INTRODUCTION

In this case, Plaintiffs Michael Hootstein, Kathlyn
Stein, and their minor grandchild, M.R. (collectively,
"Plaintiffs"), filed suit against a number of current and
former employees of the Massachusetts Department of Children
and Families ("DCF"),[1] alleging, inter alia, that Defendants
violated Plaintiffs' constitutional rights under the First,
Fourth, and Fourteenth Amendments to the United States
Constitution, deprived them of civil rights guaranteed by
Massachusetts law, and failed to comply with Mass. Gen. Laws
ch. 66A and numerous state regulations.  All of these

---

[1] The DCF was formerly known as the Department of Social
Services.  For clarity's sake, this memorandum will only use
the department's current name.

allegations relate to abuses that Plaintiffs claim they suffered during the course of child custody proceedings in both the Juvenile, and the Family and Probate, state courts from January 2004 to September 2006.

Plaintiffs originally filed suit against five current or former DCF employees in their individual capacities, seeking monetary damages.  After receiving permission from this court to amend their complaint, on May 5, 2009, Plaintiffs filed an amended complaint to add a claim for "injunctive and equity relief" against former DCF Commissioner, Lewis "Harry" Spence ("Defendant Spence"), in his official capacity.  On November 19, 2009, this court granted Defendant Spence's Motion to Dismiss, finding that the claim against him was precluded by the Eleventh Amendment.  (Dkt. No. 81).

In the motions currently before this court, the remaining Defendants -- Rome, Collins, Molina, Kipp, and Greenburg -- all move for summary judgment.  All Defendants assert that Plaintiffs have not established sufficient facts to maintain their federal constitutional claims.[2]

---

[2]  Though, in form, Defendants have argued that Plaintiffs have failed to state a claim upon which relief can be granted, the substance of Defendants' arguments really amounts to an assertion that Plaintiffs have failed to establish a genuine issue of material fact as to any of their remaining claims.

Additionally, Defendant Rome argues that he is entitled to absolute immunity, and Defendants Collins, Molina, Kipp, and Greenberg contend they are protected by the doctrine of qualified immunity.  Finally, Defendants argue that if this court were to find that they are entitled to summary judgment on Plaintiffs' federal claims, then this court should exercise its discretion and dismiss Plaintiffs' state law claims for lack of jurisdiction.

For the reasons set out below, Defendants' Motions for Summary Judgment will be allowed.

## II. <u>FACTS</u>[3]

---

[3] The facts are drawn from Dkt. No. 59, Defs.' Statement of Material Facts, and Dkt. No. 77, Pls.' Statement of Material Facts.  Plaintiffs uniformly failed to cite to contrary evidence in the record that would cast doubt on the Defendants' version of events.  Thus, this recitation of the facts is, by and large, drawn from Defendants' account. Where Plaintiffs allege additional <u>material</u> facts that Defendants omitted, this memorandum has accounted for those facts.  Plaintiffs' failure to contest the Defendants' account runs counter to the Supreme Court's admonition that, when a party moves for summary judgment, the non-moving party must cite some evidence of record that casts doubt on the particular facts asserted by the moving party.  See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986) (stating that "when a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'") (quoting Fed. R. Civ. P. 56(e)); <u>see</u> <u>also</u> D. Mass. R. 56.1 (requiring that a non-moving party's opposition to a motion for summary judgment include "a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page

Defendants are sued in their individual capacities as employees of the Massachusetts DCF: Defendant Rome is an attorney for DCF; Defendant Collins is the Greenfield Regional Director; Defendant Greenberg is an Area Program Manager who has been employed by DCF for approximately twenty-two years in various capacities; Defendant Kipp is a supervisor for DCF in the Greenfield Regional Office; and Defendant Molina is a social worker for DCF, also located in the Greenfield Regional Office.

Plaintiffs Michael Hootstein and Kathlyn Stein ("Plaintiff Grandparents") are the maternal grandparents of M.R. (the "grandson"), a minor child who first came to DCF's attention when, in January of 2004, a mandated reporter filed a complaint with DCF pursuant to Mass. Gen. Laws ch. 119, § 51A, alleging that the grandson's parents were neglecting him.  After an investigation under Mass. Gen. Laws ch. 119, §51B, on January 21, 2004, DCF determined that it would support the allegations of parental neglect of the grandson because he had been present during a domestic dispute between his parents.  As a result of the decision to support those neglect allegations, DCF began an assessment of the grandson's parents in order to provide social

---

references to affidavits, depositions and other documentation.").

4

services to them.  On January 21, 2004, Defendant Molina was assigned as Case Manager and Defendant Kipp was assigned as Supervisor for a case involving the grandson, his mother (Plaintiff Michael Hootstein's daughter), and the grandson's father.

Plaintiff Grandparents were actively involved in this process from the beginning, informing DCF that their daughter suffered from an untreated mental health disability that affected her ability to take care of their grandson. On several occasions, Plaintiff Grandparents contacted DCF or filed formal complaints, alleging that their grandson was being emotionally abused by his mother and also by the DCF social worker assigned to the investigation.

Eventually, the grandson began staying with Plaintiff Grandparents three or four nights a week, and Plaintiff Grandparents sought and obtained written consent from the grandson's parents to seek permanent co-guardianship. Plaintiffs assert that they informed the DCF staff involved in their grandson's case about this living arrangement.  On or about June 28, 2004, Plaintiff Grandparents formally petitioned the Franklin County Family and Probate Court for approval of this "co-guardianship."  After their daughter's mental condition allegedly worsened, Plaintiff Grandparents also filed an Emergency Motion for Temporary Guardianship of

a Minor Child with the same Franklin County Family and
Probate Court on or about October 27, 2004.

Two days later, on October 29, 2004, Defendant Molina
filed a Care and Protection petition in Franklin County
Juvenile Court pursuant to Mass. Gen. Laws ch. 119, § 24
because of similar concerns about the deteriorating mental
condition of the grandson's mother.  At the time the Care
and Protection Petition was filed in Greenfield Juvenile
Court, the grandson was officially residing with his mother
in Shutesbury, Massachusetts, and was also in her legal
custody.  As required under Mass. Gen. Laws ch. 199, § 24,
DCF notified the grandson's parents -- who were the
grandson's legal custodians at the time -- of the Care and
Protection Petition.

Plaintiff Grandparents assert that they should have
been notified of this Juvenile Court proceeding, given that
their grandson was staying with them during part of the week
and because they had a pending Temporary Guardianship
Petition in the Franklin County Probate Court.
Additionally, Plaintiffs allege that DCF prevented both the
Grandparents and the court-appointed Guardian Ad Litem who
was representing the grandson in the Grandparents' Probate
Court guardianship proceeding from participating in the
initial hearing on DCF's Care and Protection Petition in

Juvenile Court, despite their desire to do so.

Following the hearing on the Care and Protection Hearing, on November 1, 2004, the Franklin County Juvenile Court gave legal custody of the grandson to DCF.  The physical custody of the grandson remained with his mother at that time.  This decision was affirmed at the so-called "seventy-two-hour" hearing that took place on November 4, 2004.  Plaintiff Grandparents contend that, prior to the start of this proceeding, Defendants -- via DCF counsel -- threatened them (and the attorney that was representing them at the time), saying that they would never see their grandson again if they intervened in the Care and Protection Petition proceedings.

In light of the ruling on the Care and Protection Petition filed by DCF, the Franklin County Family and Probate Court stayed the proceedings on Plaintiff Grandparents' Emergency Temporary Guardianship Petition while the grandson was in DCF's legal custody.  The Probate Court indicated that it would mark Plaintiff Grandparents' emergency petition for hearing once DCF's legal custody ended.

On November 17, 2004, after the grandson's mother was evicted from Jesse's House (a shelter where she moved following the commencement of the Care and Protection

Petition proceedings), due to her failure to follow house
rules, DCF assumed both legal and physical custody of the
grandson.  From November 17, 2004 to December 8, 2004, the
grandson was placed in a DCF-approved foster home because of
his mother's unstable living situation. The grandson was
subsequently placed temporarily with Liz and David
Hootstein, his maternal aunt and uncle, who live in the
eastern part of Massachusetts.  Plaintiff Grandparents
allege that before this new placement with the grandson's
family members occurred, Defendant Kipp called the
Grandparents and informed them that DCF would not approve
this placement with the aunt and uncle unless the
Grandparents withdrew a Registration of Interest ("ROI")
that they had filed in mid-November 2004 to become the
grandson's foster/kinship placement under the procedures
established in 110 Mass. Code Regs. 7.103 and 110 Mass. Code
Regs. 7.108.  According to Plaintiff Grandparents, they
acceded to Defendant Kipp's demand because they feared that
their grandson was being emotionally and physically abused
in the foster home and preferred that he be placed with
relatives.

Plaintiff Grandparents also allege that DCF initially
refused to grant them any visitation rights with their
grandson after it filed the Care and Protection Petition.

8

Despite their objections to this policy and despite the fact
that they were represented by able counsel, Plaintiff
Grandparents did not appeal DCF's no-visitation decision in
either the state courts or through DCF's fair hearing
process outlined in Mass. Gen. Laws ch. 119, § 23.

In December of 2004, however, DCF decided that
Plaintiff Grandparents could have supervised visitation with
the grandson once a month for two hours at a time.
Subsequently, in March of that same year, the Grandparents
were permitted to have unsupervised contact with their
grandson.  According to Plaintiff Grandparents, following
DCF's March decision regarding visitation, their grandson
also began staying with them two to three nights a week.
Some time early in April 2005, Plaintiff Grandparents,
through their counsel, filed a motion to intervene in DCF's
Care and Protection Petition proceeding in the Franklin
County Juvenile Court.  This motion would have allowed
Plaintiff Grandparents to officially take part in any future
proceedings regarding DCF's Care and Protection Petition.
Plaintiff Grandparents allege that DCF opposed this
intervention.

Later that spring, on May 10, 2005, Plaintiffs filed a
new ROI to become the grandson's foster/kinship placement.
As foster parent/kinship placements for their grandson,

Plaintiffs were required to undergo criminal background
checks pursuant to Mass. Gen. Laws ch. 210, § 3B and 110
Mass. Code Regs. 7.100(3)(a) and 110 Mass. Code Regs. 7.104
(3).  DCF received Plaintiff Michael Hootstein's Criminal
Offender Record Information ("CORI") report from the
Massachusetts Criminal History System Board on May 20, 2005.
This CORI report disclosed that some unspecified criminal
charges had been filed against Mr. Hootstein over thirty
years earlier but that the charges were either dropped or
Mr. Hootstein was acquitted.  Within a week, on May 24,
2005, Defendant Kipp filed a Background Record Check Waiver
Request for Plaintiff Michael Hootstein.  On June 7, 2005,
Defendant Collins, as the Area Director, granted the Waiver
Request because:

> The (criminal) charges are over 30 years old
> without new complaints arising. The applicant
> (Michael Hootstein) states he no longer uses
> illegal substances. The DSS history was reviewed
> . . . and the explanation offered by the applicant
> is consistent with the record.  No abuse/neglect
> was supported and probate court granted him full
> custody (of his daughter).

After the Waiver Request was signed, on or about June
9, 2005, and after a visit with Plaintiffs, DCF allowed the
grandson to begin living with Plaintiff Grandparents on a
daily basis, pending completion of the foster parent/kinship
placement review.  Plaintiffs' physical custody of their
grandson was continuous from this point in June until they

10

were finally approved as his guardians.  However, Plaintiffs
allege that on June 24, 2005, unspecified Defendants
conducted a forensic evaluation of their grandson without
their permission while he was with his mother during a
supervised visitation.  According to Plaintiff Grandparents,
when they came to pick up their grandson at the conclusion
of this visit, two Greenfield police officers and some
unspecified Defendants allegedly threatened to remove the
Grandson from the Grandfather's custody.  Plaintiff
Grandparents assert that unspecified Defendants and the
police officers made this threat in order to coerce their
future compliance with DCF's requests.  According to
Plaintiffs' account, however, the grandson was ultimately
released to their custody.

Some time in June of 2005, Defendant Collins decided to
convene a Clinical Review Team ("CRT") panel to review the
grandson's foster/kinship placement with Plaintiff
Grandparents.  As the Area Director of the Greenfield DCF
Office, Defendant Collins had the discretion under 110 Mass.
Code Regs. 10.08(2) to convene a CRT with respect to any
foster/kinship placements in order to review goal
determinations.  In the usual course, after a panel meets,
the CRT then makes recommendations to the Area Director
about cases involving any foster/kinship placements.  On

June 13, 2005, Defendants Kipp and Molina made a presentation to a DCF Regional CRT that was considering the foster parent/kinship placement of the grandson with Plaintiffs.  Defendant Collins was a member of this panel. Plaintiff Grandparents complain that they were not informed of this proceeding, that they were not allowed to participate in it, and that false information was disseminated about them during this CRT proceeding.

After considering the presentations, the CRT panel recommended that the Greenfield Area Office complete a Family Resource Evaluation (Homestudy); the panel also requested evaluations of Plaintiff Grandparents, which were to be conducted by Children's Charter, Inc., a third party that contracts with DCF.  The evaluations were requested as a condition of placement, Defendants assert, because of Plaintiff's daughter's ultimately unfounded accusations that he abused her as a child.  Plaintiffs were requested to undergo an evaluation pursuant to 110 Mass. Code Regs. 7.104(2), which states:

> A foster/pre-adoptive parent applicant or any member of her/his household must be free of any physical, mental or emotional illness or handicap which, in the judgment of the Department, would impair his or her ability to assume and carry out the responsibilities of a foster/pre-adoptive parent. However, no illness or handicap in and of itself shall disqualify an individual from becoming a foster/pre-adoptive parent.

110 Mass. Code Regs. 7.104(2).

On or about June 20, 2005, Defendant Collins informed Plaintiffs of these requirements for the approval of their foster parent/kinship placement.  Also on June 20, 2005, Plaintiffs filed a Family Resource Application to become the foster parent/kinship placement for their grandson. Defendant Rome, as an attorney for DCF, drafted an agreement setting out that Plaintiffs would participate in the Children's Charter evaluation and forwarded it to Plaintiffs' attorney.  Plaintiffs' attorney reviewed the agreement and contacted Defendant Rome, requesting that some changes be made to the substance of the agreement, including adding an evaluation of Plaintiff Grandparents' daughter. According to Plaintiffs, during the course of this conversation, Attorney Rome informed their counsel that DCF would not approve Plaintiffs as foster parents for their grandson without this evaluation.

One month later, on July 20, 2005, Plaintiffs and their daughter agreed to participate in a comprehensive family evaluation to be performed by Children's Charter.  Defendant Collins signed the Agreement on behalf of DCF, and Plaintiff Grandparents also signed it.  Defendant Molina was also present and witnessed the signature of Plaintiffs' daughter. According to the agreement, the purpose of this evaluation

13

was to ensure that the placement with the Plaintiff
Grandparents would meet the needs of the grandson, to
support the efforts of the mother toward a permanent plan
that was in the grandson's best interests, to evaluate the
mother's current mental health status and the effect of her
mental health status on the grandson, and to ensure that
Plaintiff Grandparents could support the child's
relationship with the mother.

On or about August 2, 2005, Carolyn Browning, a DCF
social worker, completed a draft Family Resource Assessment.
This report supported the grandson's placement with
Plaintiff Grandparents.  Upon receipt of the draft Family
Resource Assessment, Defendant Greenberg noted in Section K,
Recommendations that:

> This is a draft study. No formal approval has been
> given at this time as there are outstanding
> evaluations being done on this family by
> Children's Charter.  Once those reports are
> received, a formal decision will be made [sic] the
> homestudy reviewed.

Plaintiff Grandparents allege that Ms. Browning's favorable
recommendations were deleted and replaced by Defendant
Greenberg's notation that DCF was awaiting the report from
Children's Charter.  However, Plaintiff Grandparents can
point to no actual evidence that Defendant Greenberg's
notation was anything other than an addendum to Ms.
Browning's report or to evidence that any changes were made

14

to the conclusions contained in the draft Family Resource
Assessment.

Two days after Ms. Browning submitted this Assessment,
on August 2, 2005, Plaintiff Grandparents, through their
counsel at the time, filed a request for guardianship with
the Franklin County Juvenile Court.  On August 11, 2005, the
grandson's case was transferred from Ms. Molina to Mary
Ramon.  Ms. Ramon, who is not named as a Defendant in this
case, thereafter served as Case Manager.  DCF subsequently
received the Children's Charter "Independent Evaluations of
the Plaintiffs and the Children's Charter Independent
Evaluations: Family Study" on October 24, 2005.

Defendant Collins participated as a panel member in a
second CRT that was re-convened under 110 Mass. Code Regs.
10.08 and held at the Western Regional Office of DCF on
November 14, 2005.  Defendants Greenberg and Kipp and
Carolyn Browning were presenters at this CRT.  After
reviewing Children's Charter's evaluations of Plaintiff
Grandparents, the second CRT concluded that physical custody
of the grandson should remain with Plaintiffs, and
Plaintiffs' Family Resource Application as a foster
parent/kinship placement for their grandson was approved.
The CRT further decided that DCF would have no objection to
Plaintiff Grandparents seeking a third-party guardianship of

15

their grandson.  On November 18, 2005, Defendant Greenberg

made the following additional notation in Section K,

Recommendations of the Family Resource Assessment:

> Regional CRT on 11-14-05 concerning the approval
> of the home and continued placement of [grandson].
> Children's Charter Evals were completed and
> recommended that [grandson] remain in Kathy and
> Michael's home. Recommendations that Michael to
> become re-engaged with Dr. Michael Childs to
> understand his stress tolerance and the impact
> this may have.  Michael Hootstein reports that he
> has become re-involved with Dr. Childs. CRT panel
> also agreed home to be approved and no objection
> [by DCF] to be raised regarding Kathy and
> Michael's petition for 3rd party custody.

On September 25, 2006, the Franklin County Juvenile

Court approved Plaintiff Grandparents' petition for

guardianship of their grandson.  DCF had no objection to

Plaintiff Grandparents seeking a third-party guardianship of

their grandson, but it did not sponsor the guardianship.

After September 25, 2006, DCF's regular foster care payments

to the Plaintiffs for the kinship placement pursuant to 110

CMR 7.108 were terminated because of the court's approval of

the guardianship.

## III.  DISCUSSION

The complaint includes thirteen counts, including

claims brought under 42 U.S.C. § 1983, alleging violations

of Plaintiff Grandparents' constitutional rights, as well as

various related state law claims.  By and large, the

16

complaint fails to identify which Defendants are implicated by each count and generally only sets out that unspecified "Defendants" are responsible for the constitutional and state law violations that Plaintiff Grandparents have pled. Given the lack of specificity in Plaintiffs' pleadings and arguments and the rather nebulous nature of the claims made in each Count, and since all Defendants have moved for summary judgment on the same grounds, this memorandum will chart the simplest course through this uneven terrain by first dealing with Plaintiffs' federal claims and Defendants' claims of qualified (and, in one case, absolute) immunity.  This memorandum will then turn to whether this court should exercise jurisdiction over Plaintiff Grandparents' state law claims if it grants summary judgment in favor of Defendants on Plaintiffs' federal claims.

A.    The Summary Judgment Standard

A motion for summary judgment must be granted if:

[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).  Accordingly, the moving party must establish that there is "an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477

17

U.S. 317, 325 (1986).  If the party moving for summary
judgment succeeds, the burden shifts to the party opposing
summary judgment to establish the existence of a factual
issue that is both "material," meaning that it might affect
the outcome of the litigation, and "genuine," meaning that a
reasonable jury could, on the basis of the proffered proof,
return a verdict for the opponent.  <u>Anderson v. Liberty
Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  While this court
must resolve any factual controversies in favor of the
non-moving party, <u>Lujan v. National Wildlife Federation</u>, 497
U.S. 871, 888-88 (1990), the non-movant cannot rest upon
mere allegations; rather, it must set forth specific,
provable facts demonstrating that there is a triable issue.
<u>Brennan v. Hendrigan</u>, 888 F.2d 189, 191 (1st Cir. 1989).
This court must grant the motion for summary judgment if it
determines there are no genuine issues to be resolved at
trial because there is not "sufficient evidence favoring the
nonmoving party for a jury to return a verdict for that
party."  <u>Anderson</u>, 477 U.S. at 249-50.

    In their opposition to Defendants' motions for summary
judgment, Plaintiffs made a glancing argument that summary
judgment was not appropriate in this case at this time
because: (1) while Defendants filed an answer to Plaintiffs'
original complaint, they had not yet filed an answer to

Plaintiffs' amended complaint and a motion for summary judgment is not a proper responsive pleading to a complaint and, (2) at the time Defendants filed for summary judgment, discovery had not yet been completed.

Plaintiffs' first objection to Defendants' motion for summary was disposed of when Defendants, acting at this court's direction, filed an answer on December 15, 2009. (Dkt. No. 83.)

Plaintiffs' second objection to Defendants' motion for summary judgment is equally unavailing.  Fed. R. Civ. P. 56(f) does provide what the First Circuit has called an "escape hatch" for a party "who genuinely requires additional time to marshal 'facts essential to justify [its] opposition' when confronted by a summary judgment motion." Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co., 840 F.2d 985, 988 (1st Cir. 1988) (quoting Herbert v. Wicklund, 744 F.2d 218, 221 (1st Cir.1984). However, in order to take advantage of that escape hatch, Plaintiffs were required -- at the very least -- to file a document with the court that articulates "some plausible basis for the party's belief that specified 'discoverable' material facts likely exist which have not yet come in from the cold."  Paterson-Leitch Co., Inc., 840 F.2d at 988.

While strict adherence with the dictates of Rule 56(f)

19

are not required, a party's failure to file a Rule 56(f)
affidavit or some other authoritative document -- filed
under penalty of perjury or by written representations of
counsel subject to the strictures of Fed. R. Civ. P. 11 --
is fatal to a party's request that a court postpone its
decision on a motion for summary judgment until that party
receives any outstanding discovery.  Id.; Herbert, 744 F.2d
at 221-22.  In this case, Plaintiffs failed to provide this
court with any such authoritative document outlining what
further discoverable material facts might exist that would
have an impact on the court's consideration of Defendants'
motion for summary judgment.  Given this failure to abide by
either the letter or the spirit of Rule 56(f), Plaintiffs'
contention that summary judgment is untimely carries no
weight.

B.    Absolute Immunity

In Defendant Rome's Motion for Summary Judgment (Dkt.
No. 51), he claims that, as a DCF attorney who was merely
negotiating an agreement with Plaintiff Grandparents'
attorney, he should be entitled to absolute immunity.  The
Supreme Court has granted absolute immunity from liability
to a select number of government officials, including: the
President of the United States, Nixon v. Fitzgerald, 457
U.S. 731 (1982); judges, Stump v. Sparkman, 435 U.S. 349

(1978); legislators, <u>Eastland v. United States Serviceman's Fund</u>, 421 U.S. 491 (1976); prosecutors, <u>Imbler v. Pachtman</u>, 424 U.S. 409 (1976); and high executive officers engaged in adjudicative or quasi-judicial functions, <u>Butz v. Economou</u>, 438 U.S. 478.  However, the Supreme Court has also emphasized that absolute immunity should be rarely granted, see <u>Cleavinger v. Saxner</u>, 474 U.S. 193, 202 (1985), and that "[f]or executive officers in general, . . . qualified immunity represents the norm." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 807 (1982).  Thus, state officers who seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires such an exemption.  <u>Butz</u>, 438 U.S. at 506.

To determine whether absolute immunity should apply, a court should consider: (1) whether a historical or common law basis exists for immunity from suit arising out of performance of the function; (2) whether performance of the function poses obvious risks of harassing or vexatious litigation against the official; and (3) whether there exist alternatives to damage suits against the official as a means of redressing wrongful conduct.  <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 521-523 (1985).  Defendant Rome argues that since absolute immunity has been extended to prosecutors, <u>see</u>

*Imbler*, *supra*, high executive officers engaged in adjudicative or quasi-judicial functions, see *Butz*, *supra*, and to government attorneys who initiate civil litigation in a state or federal court, see *Barrett v. United States*, 798 F.2d 565, 572 (2d Cir.1986), it should also be extended to attorneys who are negotiating agreements with private parties on behalf of government agencies.

According to Defendant Rome, he was merely acting within the scope of his employment as a DCF attorney when he negotiated the agreement with Plaintiff Grandparents' attorney, and he should be protected from exposure to lawsuits given this role.  However, since Defendant Rome's argument for absolute immunity begins and ends with this assertion and with a conclusory statement that the performance of his duties might be inhibited by the threat of harassing lawsuits, and since he bears the burden of establishing that he is entitled to absolute immunity, this court cannot find that he is entitled to absolute immunity in this case.  For the reasons set forth below, however, Defendant Rome, along with the other Defendants, is entitled to qualified immunity.

## C.   Qualified Immunity

As noted above, all Defendants, with the exception of

Defendant Rome, moved for summary judgment on Plaintiff
Grandparents' claims under 42 U.S.C. § 1983 based on an
assertion that they are entitled to qualified immunity.[4]
State actors are protected from damages under § 1983 if
"they have performed discretionary functions falling within
the scope of their authority and have done so in an
objectively reasonable manner, measured by the state of the
law at the time the conduct occurred."  Brennan, 888 F.2d at
192 (citations omitted).  The qualified immunity doctrine
provides defendant public officials an immunity from suit
and not a mere defense to liability.  Mitchell v. Forsyth,
472 U.S. 511, 526 (1985).  Therefore, whether the defendants
are entitled to qualified immunity should be resolved at the
earliest possible stage in litigation.  Hunter v. Bryant,
502 U.S. 224, 227 (1991).

In order to determine if state actors are entitled to
qualified immunity, a court must decide: (1) whether the
facts alleged or shown by the plaintiff make out a violation
of a constitutional right; and (2) if so, whether the right

---

[4] Defendant Rome did plead a qualified immunity defense,
See Defs.' Answer to Amended Complaint with Jury Demand,
Dkt. No. 83, and at oral argument on the motions for summary
judgment, counsel for Defendant Rome indicated that, if this
court did not grant his request for absolute immunity, then
this court should consider whether he was entitled to
qualified immunity.

was "clearly established" at the time of the defendant's
alleged violation.  <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 269
(1st Cir. 2009).  In conducting this analysis, "[c]ourts
have discretion to decide whether, on the facts of a
particular case, it is worthwhile to address first whether
the facts alleged make out a violation of a constitutional
right."  <u>Id.</u> at 270.

     If the plaintiffs have established sufficient facts
that would support their allegations that the defendants
violated their constitutional rights, a court must then move
on to the second prong and determine if the right was
clearly established at the time of defendants' actions.  The
Supreme Court has held that to find a "clearly established"
constitutional right "[t]he contours of the right must be
sufficiently clear [such] that a reasonable official would
understand that what he is doing violates that right."
<u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987).  While it
is not true that officials' actions are protected by
qualified immunity unless the specific actions in question
have previously been held unlawful, the illegality of their
actions must have been apparent given the state of pre-
existing law.  <u>Id.</u>  Finally, officials do not lose their
immunity merely by violating a federal or state law, unless
that law provides the basis for the plaintiffs' cause of

action.  <u>Davis v. Scherer</u>, 468 U.S. 183, 194 n. 12 (1984).

If, after canvassing the evidence presented, the district court finds that there is not some genuine factual issue about whether the defendants violated the plaintiffs' constitutional rights, then the court must grant the motion for summary judgment based on the defendants' claims to qualified immunity.  <u>See</u> <u>Lipsett v. University of Puerto Rico</u>, 864 F.2d 881, 895 (1st Cir. 1988).  In this case, Plaintiff Grandparents fail to clear the first prong of the qualified immunity analysis because they have not set forth sufficient facts in support of any count in their complaint that are sufficient to maintain their claims that Defendants violated their constitutional rights.  Thus, Defendants are entitled to qualified immunity.  This memorandum will now turn to each count of Plaintiff Grandparents' Amended Complaint that contains a federal cause of action under the United States Constitution and 42 U.S.C. § 1983 and delineate why Plaintiff Grandparents have failed to establish a genuine issue of material fact as to whether Defendants violated Plaintiffs' constitutional rights.

D.   <u>Count II: Alleged Violations of Plaintiffs' Fourteenth Amendment Rights to Procedural and Substantive Due Process</u>

Count II of the complaint alleges that Defendants violated the Fourteenth Amendment by denying Plaintiff

Grandparents' substantive due process rights, as well as their procedural due process rights.  This court will first examine the procedural due process claims and then consider Plaintiffs' substantive due process allegations.

1.   <u>Procedural Due Process</u>

The basic protections provided by the constitutional requirement of due process of law require that, before a significant deprivation of liberty or property takes place at the state's hands, the affected individuals must be forewarned and afforded an opportunity to be heard "at a meaningful time and in a meaningful manner."  <u>Armstrong v. Manzo</u>, 380 U.S. 545, 552 (1965).  Thus, at its core, "procedural due process" is simply "a guarantee of fair procedure."  <u>Zinermon v. Burch</u>, 494 U.S. 113, 125 (1990).  Where procedural due process must be afforded because a liberty or property interest is within the Fourteenth Amendment's protection, a court must determine "what process is due" in the particular context.  <u>Smith v. Organization of Foster Families For Equality and Reform</u>, 431 U.S. 816, 847 (1977).

The adequacy of state procedures cannot be determined by any rigid formula; rather, "due process is flexible and calls for such procedural protections as the particular situation demands."  <u>Morrissey v. Brewer</u>, 408 U.S. 471, 481,

92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).  Courts must
therefore evaluate procedural due process claims according
to a sliding scale, balancing a number of factors,
including: (1) the nature of the private and public
interests involved; (2) the risk of erroneous deprivation
accruing under the procedures used by the state; and (3) the
probable benefit of demanding additional procedural
safeguards.  See Mathews v. Eldridge, 424 U.S. 319, 335
(1976).

When a complaint alleges violations of procedural due
process and asserts that those violations are actionable
under 42 U.S.C. § 1983, the existence of state remedies is
especially relevant.  Zinermon, 494 U.S. at 125.  A
reviewing court must therefore examine "the procedural
safeguards built into the statutory or administrative
procedure . . . [a]ffecting the deprivation, and any
remedies for erroneous deprivations provided by statute or
tort law."  Amsden v. Moran, 904 F.2d 748, 755 (1st Cir.
1990) (citations omitted).  Procedural due process requires
that the procedures provided by the state in affecting the
deprivation of liberty or property are adequate in light of
the interest at stake.  Pittsley v. Warish, 927 F.2d 3, 6
(1st Cir. 1991)

Here, Plaintiff Grandparents have alleged that DCF's

27

involvement in the custody proceedings regarding their grandson violated their liberty interests in familial integrity and in conducting their family life free from governmental intrusion, see Smith, 431 U.S. at 842, without providing them with adequate procedural protections.  The Supreme Court has noted that rights to the custody and care of children reside first with their parents, Prince v. Massachusetts, 321 U.S. 158, 166 (1944), and that the scope of these rights may extend beyond natural parents to grandparents and other relatives.  Smith, 431 U.S. at 842 n.49.

However, the protection afforded to the parents' (or other relatives' or caretakers') interests must be balanced against other valid concerns, especially the best interests of the child, as well as society's interest in the maturation of children as future citizens. See Frazier v. Bailey, 957 F.2d 920, 929-30 (1st Cir.1992).  Thus, the state can freely investigate allegations of child abuse, Watterson v. Page, 987 F.2d 1, 8 (1st Cir. 1993), and if it develops clear and convincing evidence of parental unfitness, it may move to permanently terminate the relationship between parent and child.  Santosky v. Kramer, 455 U.S. 745, 747-48 (1982).  Additionally, the state may separate the child from the parent, before any hearing in

28

which it would be required to show cause for such a
separation.  Hatch v. Department for Children, Youth and
Their Families, 274 F.3d 12, 20 -21 (1st Cir. 2001).

In this case, Plaintiff Grandparents first assert that
Defendants deprived them of their interests in familial
integrity without providing for adequate procedures, by
filing the Care and Protection Petition in the Franklin
County Juvenile Court in order to "thwart" their separate
guardianship petition in the Franklin County Probate Court,
by failing to notify them of the existence of Care and
Protection Petition, by not listing them as the parents or
guardians of their grandson on the court documents, by not
disclosing Plaintiff Grandparents' emergency guardianship to
the Franklin County Juvenile Court, and by refusing to allow
them to participate in the initial proceedings.

Despite these claims, the law is clear that DCF was
acting well within established statutory and constitutional
limitations in their actions in regard to this first
proceeding.  Mass. Gen. Laws ch. 119, § 24 provides a
three-part process by which a court may transfer custody of
a child from that child's parent to DCF.  Section 24 states
that on the petition of any person alleging that a child is
without: "(a) necessary and proper physical or educational
care and discipline; or (b) is growing up under conditions

or circumstances damaging to the child's sound character
development; or (c) who lacks proper attention of parent,
guardian with care and custody, or custodian; or (d) whose
parents, guardian or custodian are unwilling, incompetent or
unavailable to provide any such care," the court shall issue
a notice to DCF and summonses to the child's <u>parents</u> and
hold an initial hearing allowing for a presentation of facts
as to the condition of the child.  Mass. Gen. Laws ch. 119,
§ 24.

In this case, DCF filed such a petition with the
Juvenile Court because it had received reports that the
grandson was being abused and/or neglected.  Once the
petition was filed, notice of the emergency hearing was sent
to the grandson's parents, as required by the statute.
Although Plaintiff Grandparents may have had a private
agreement with their daughter that they would serve as co-
guardians for their grandson, and though Plaintiff
Grandparents may have already filed their own petition for
guardianship, Defendants had no obligation under state or
federal law to notify Plaintiff Grandparents of the initial
hearing.  Additionally, because of the need for expedition
in this type of proceeding, the emergency hearing, much like
a hearing for a temporary restraining order, may be held <u>in</u>
<u>camera</u> or even <u>ex</u> <u>parte</u>.  <u>Care and Protection of Robert</u>, 556

N.E.2d 993, 995 (Mass. 1990).  Thus, there was no statutory requirement that Plaintiff Grandparents be allowed to participate in the initial proceedings, and, as outlined above, the Supreme Court has upheld the constitutionality of this kind of emergency procedure in the past.

Plaintiff Grandparents also assert that they were prevented from participating in the subsequent hearing that took place after the Franklin County Juvenile Court initially awarded DCF legal custody of the grandson.  Under the procedures set out by Mass. Gen. Laws ch. 119, § 24, if the court finds that there is reasonable cause to issue an emergency order transferring custody of a child following the initial emergency hearing, then, within seventy-two hours from the initial time of the transfer of custody, the court must hold a second hearing, the so-called "seventy-two hour hearing," to "determine whether such temporary custody should continue until a hearing on the merits of the petition for care and protection [a third hearing] is concluded before [the] court."  Mass. Gen. Laws ch. 119, § 24; Care and Protection of Robert, 556 N.E.2d at 995-996.

The Franklin County Juvenile Court held a seventy-two hour hearing on November 4, 2004, and Plaintiff Grandparents allege that Defendants prevented them from filing a motion to intervene in these proceedings in order to be heard, as

31

they were entitled to do.  See Care and Protection of
Manuel, 703 N.E.2d 211, 217 (Mass. 1998).  According to
Plaintiffs, because of statements made by unspecified
Defendants, they feared that if they did intervene, they
would not get to see their grandson again.

It may be true -- and for purposes of this motion for
summary judgment, this court must assume that it is true --
that some DCF employees made statements that caused
Plaintiff Grandparents to become concerned about a risk to
their relationship with their grandson.  However, this
discomfort does not amount to a violation of Plaintiffs'
constitutional rights.  The Supreme Court has ruled that in
cases in which officials make mistakes in judgment --
regardless of whether those mistakes are merely negligent or
actually deliberate -- there is no denial of procedural due
process, so long as the state provides an adequate means of
redress.  Herwins v. City of Revere, 163 F.3d 15, 19 (1st
Cir. 1998).

In this case, there is no evidence that Plaintiffs, who
were represented by competent counsel at this point, were
actually prevented from availing themselves of the
protections set out in Mass. Gen. Laws ch. 119, § 24 during
the course of the Care and Protection Petition proceedings.
In fact, Plaintiffs eventually did file a motion to

intervene in this process in April 2005, despite DCF's alleged continuing opposition to this intervention.  Thus, even if this court assumes that DCF made statements to Plaintiff Grandparents that could somehow be construed as threatening, there is no evidence that Plaintiffs had no means of redress and no evidence that these statements amounted to a violation of Plaintiffs' rights to procedural due process.

Plaintiffs also complain that DCF's decision to file the Care and Protection Petition in Juvenile Court sabotaged and blocked their own emergency guardianship petition and denied them access to the Franklin County Probate Court. However, DCF's decision to file a Care and Protection did not end the Probate Court's consideration of their emergency petition; rather, that court merely stayed consideration of Plaintiffs' petition, pending the outcome of the separate Care and Protection Petition proceedings in the Juvenile Court.  Plaintiff Grandparents were still able to file motions with the Probate Court and with the Juvenile Court, and actually availed themselves of that opportunity. Indeed, as they set out in their own version of the facts, it was the Juvenile Court that ultimately awarded them guardianship of their grandson.

Finally, Plaintiff Grandparents contend that they were

deprived of their liberty interests in familial integrity
without due process because they were initially not
permitted any visitation with their grandson.  However, they
could have appealed DCF's decision to deny visitation
through the state courts, see Mass. Gen. Laws ch. 30A, or
through DCF's fair hearing process.  See Mass. Gen. Laws ch.
119, § 23.  As Plaintiffs readily admit, they declined the
opportunity to avail themselves of these procedures, because
they believed that any proceedings would be unfairly rigged
against them.  While their subjective feelings about the
process may have prevented them from taking advantage of the
procedures open to them, this is not enough to establish
that they were denied their rights to adequate process to
redress their grievances.

     In sum, this is not a case in which Plaintiff
Grandparents were excluded from participating in the child
custody proceedings or a case in which the courthouse doors
were closed to them when they wanted to intervene in the
process.  Cf. Rivera v. Marcus, 696 F.2d 1016 (2d Cir. 1982)
(holding that Plaintiff, who provided foster care for her
half brother and sister, had liberty interest in preserving
familial relationship and that termination of foster care
agreement with state -- without any notice of reasons for
termination or any opportunity to retain counsel or be heard

34

in subsequent proceedings -- violated her rights to procedural due process).  Thus, Plaintiff Grandparents cannot point to any facts that would justify a jury in concluding that their procedural due process rights were violated.  Defendants are therefore entitled to qualified immunity as to any claims of violation of procedural due process, as set forth in Count II.

    2.  <u>Substantive Due Process</u>

While procedural due process defines what process the government must provide if it deprives a citizen of a protected liberty interest, substantive due process imposes limits on what a state may do, regardless of what procedural protection is provided.  <u>Pittsley v. Warish</u>, 927 F.2d 3, 6 (1st Cir. 1991).  Substantive due process protects individuals against a narrow swath of impermissible state actions, including those that are "arbitrary and capricious," those that run counter to "the concept of ordered liberty," or those that appear "shocking or violative of universal standards of decency."  <u>Amsden v. Moran</u>, 904 F.2d 748, 753-754 (1st Cir. 1990) (citations omitted).  Thus, it is only when some basic and fundamental principle has been transgressed or when some state action is, in and of itself, egregiously unacceptable, outrageous, or conscience-shocking that "the constitutional line has

been crossed." Id. at 754.

The question of whether the challenged conduct shocks the contemporary conscience is the threshold matter that must be resolved before a constitutional right to be free from such behavior can be recognized. DePoutot v. Raffaelly, 424 F.3d 112, 118 (1st Cir. 2005). Mere violations of state law, even violations resulting from bad faith, do not necessarily amount to unconstitutional deprivations of substantive due process, id. at 119, and fear or emotional injury which results solely from verbal harassment or idle threats is generally not sufficient to constitute an invasion of an identified liberty interest. Pittsley v. Warish, 927 F.2d 3, 7 (1st Cir. 1991).

The complaint and opposition to the motion for summary judgment, though not always clear, appear to articulate an allegation that Defendants violated their constitutionally protected liberty interest in familial integrity, including the care, custody and supervision of their grandson. See Watterson, 987 F.2d at 7. As stated in the previous section, however, a party's interest in familial integrity is not absolute. See Frazier v. Bailey, 957 F.2d 920, 929-30 (1st Cir. 1992). For example, a state administrative agency may place a child in temporary custody when it has evidence giving rise to a reasonable and articulable

36

suspicion that the child has been abused or is in imminent peril of abuse.  Hatch, 274 F.3d at 21.  The ability to take this kind of action is related to the government's compelling interest in safeguarding children that it suspects are victims of abuse and in acting quickly on their behalf.  Id.

Here, given the allegations of neglect and/or abuse that were reported to DCF, there is little question that Defendants were acting well within constitutional bounds when they decided to initiate the Juvenile Court Care and Protection Petition proceedings under Mass. Gen. Laws ch. 119, § 24, regardless of any pending petitions that Plaintiff Grandparents may have filed separately in the Probate Court.  And, as described in detail above, despite Plaintiffs' complaints about the manner in which these proceedings went forward, there are simply no facts of record submitted to support the allegations in Count II that so shock the conscience that they would constitute a violation of Plaintiffs' substantive due process rights. Thus, Plaintiffs have not established a genuine factual issue that would support their claims that Defendants violated their substantive due process rights, and Defendants are entitled to qualified immunity as to this portion of Count II as well.

E.  <u>Count III: Unreasonable Search and Seizure in Violation
    of the Fourth Amendment</u>

Count III of the complaint alleges that Defendants
Kipp, Molina, and Collins unlawfully seized the grandson
from Plaintiff Grandparents' house on October 29, 2004, in
violation of their rights under the Fourth Amendment to the
Constitution.  The Fourth Amendment does reach interactions
with police or other law enforcement officials that stop
short of an arrest.  <u>United States v. Trullo</u>, 809 F.2d 108,
110 (1st Cir.), <u>cert. denied</u>, 482 U.S. 916 (1987).  However,
not every contact with a police officer or government
official implicates constitutional rights.  <u>See</u> <u>Lopez v.
Aran</u>, 844 F.2d 898, 904-05 (1st Cir. 1988).  If an
individual is detained, the Fourth Amendment is more deeply
implicated, but the constitutional guarantee is violated
only if the detention is unreasonable, as judged by a
balancing test that weighs the need to carry out the seizure
against the invasion involved in the police action.  <u>Id.</u> at
905.  When courts employ this balancing test, they should
consider: "(1) the gravity of the public concerns served by
the seizure; (2) the degree to which the seizure advances
the public interest; and (3) the severity of the
interference with individual liberty."  <u>Brennan v.
Hendrigan</u>, 888 F.2d 189, 193 (1st Cir. 1989) (citations
omitted).

In Count III of the complaint, Plaintiff Grandparents allege that their grandson was seized from them on October 24, 2005.  However, no physical seizure actually occurred at this time; rather, this was merely the day on which DCF filed its Care and Protection Petition in Franklin County Probate Court.  Even after the initial hearing was held on this proceeding, the grandson initially remained in the physical custody of his mother until at least November 17, 2004.

Apparently, Plaintiff Grandparents are asserting that their grandson was constructively seized from them because DCF filed the Care and Protection Petition, encouraged their daughter to move out of the house she was living in at the time and into a shelter, and discouraged contact between Plaintiffs and their grandson from the end of October 2004 until December of that year, when DCF began permitting supervised visitation.  However, Plaintiffs can cite to no case law that would support this theory that their grandson was "seized" when DCF initiated the proceedings it was statutorily permitted to begin.  See Mass. Gen. Laws ch. 119, § 24.  Additionally, Plaintiffs cannot plausibly argue that DCF unreasonably seized the grandson when they exercised the authority granted to the agency once the Franklin County Probate Court awarded them legal custody of

39

the grandson.

In their opposition to Defendants' Motion for Summary Judgment, Plaintiff Grandparents also seem to contend that Defendants illegally seized the grandson when Plaintiffs had some sort of unspecified interaction with two Greenfield police officers in June 2005. According to Plaintiffs, these Greenfield police officers were present when they came to pick up their grandson following a visitation with his mother, and the officers were allegedly given orders by some unspecified Defendants to remove the grandson from Plaintiff Grandparents' custody. While it is unclear exactly what happened during the course of this incident, Plaintiffs admit that the grandson was ultimately released to them after a brief delay, and Plaintiffs do not allege that they were ever detained by the police, much less that any detention that may have occurred was unreasonable. Given these facts, the scope of the alleged contact with the police in this case simply fails to rise to the level at which a reasonable jury could conclude that Defendants violated Plaintiffs' rights under the Fourth Amendment. Thus, there is no genuine factual issue that must be resolved regarding Plaintiffs' allegations in Count III concerning whether Defendants violated their Fourth Amendment rights, and Defendants are therefore entitled to

qualified immunity as to Count III.

F.   Count V: Violations of the First (and Fourteenth) Amendments

In Count V of the complaint, Plaintiff Grandparents allege that Defendants violated their rights under the First and Fourteenth Amendments by punishing them and retaliating against them for exercising their rights to free speech and by denying them access to the courts.

In general, plaintiffs can sustain a claim that would be actionable under the First and Fourteenth Amendments and 42 U.S.C. § 1983 if they can establish that there is a genuine factual issue as to whether a defendant's actions chilled their ability to exercise their right to free expression or if plaintiffs can prove that they eschewed protected speech in order to avoid some sort of negative official consequences.  See Meese v. Keene, 481 U.S. 465, 473 (1987).

In this case, however, by Plaintiffs' own admission, they exercised their rights to free speech when they felt they were being wronged during the course of these custody proceedings.  They filed numerous complaints with DCF regarding their perceived mistreatment and had numerous conversations about their allegations with both the DCF Ombudsman's office and with supervisors in the DCF chain of command.  Thus, there is no factual dispute regarding

whether Defendants' actions in this case somehow chilled Plaintiff Grandparents' exercise of their free speech rights.

Plaintiff Grandparents also allege that their access to the courts was blocked in violation of the First Amendment. The Supreme Court has consistently noted that the rights to assemble peaceably and to petition for a redress of grievances are among the most precious of the liberties safeguarded by the Bill of Rights.  United Mine Workers of America, Dist. 12 v. Illinois State Bar Ass'n, 389 U.S. 217, 222 (1967).  This right to petition extends to all departments of the government, and the right of access to the courts is most certainly protected by the First Amendment.  California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972).[5]

The Supreme Court has identified two general categories of cases in which plaintiffs allege that defendants have blocked their access to the courts.  Christopher v. Harbury, 536 U.S. 403, 413 (2002).  In the first category of cases

_____

[5] While Plaintiffs only allege that Defendants violated their First Amendment rights by blocking access to the courts, courts have noted that denying a person access to the courts could be considered a deprivation "of life, liberty, or property, without due process of law," in violation of the Fourteenth Amendment.  Germany v. Vance, 868 F.2d 9, 11 (1st Cir. 1989).

are claims that systemic official action frustrates
plaintiffs in their present attempts to prepare and file
lawsuits.  _Id._  According to the Supreme Court, "the
justification for recognizing that claim, is to place the
plaintiff in a position to pursue a separate claim for
relief once the frustrating condition has been removed."
_Id._  Since there is no claim that Plaintiffs are presently
being prevented from pursuing any cause of action in any
court, this case does not fit within this first rubric.

     The second category of cases, on the other hand, covers
a class of suits that cannot now be tried, no matter what
official action may occur in the future.  _Id._ at 414.  The
acts by government officials that denied access to the
courts in these cases may cause the loss or inadequate
settlement of a meritorious case, the loss of an opportunity
to sue, or the loss of an opportunity to seek some
particular order of relief.  _Id._; _see_, _e.g.,_ _Swekel v. River_
_Rouge_, 119 F.3d 1259, 1261 (6th Cir. 1997) (police coverup
extended throughout time to file suit under applicable
statute of limitations, effectively barring plaintiff from
court); _Bell v. Milwaukee_, 746 F.2d 1205, 1261 (7th Cir.
1984) (investigating police officers engaged in conspiracy
to conceal facts regarding shooting of plaintiffs' brother,
negating family's ability to seek redress in court),

43

overruled on other grounds by Russ v. Watts, 414 F.3d 783,
791 (7th Cir. 2005).

In this second category of suits in which plaintiffs
argue that defendants have improperly blocked their access
to the courts in the past, the plaintiffs would receive
relief that would not otherwise be obtainable in any other
future case. Christopher, 536 U.S. at 414. Because these
backward-looking actions are brought to receive relief that
could not be awarded in another suit, the remedy sought must
"be identified to hedge against the risk that an access
claim be tried all the way through, only to find that the
court can award no remedy that the plaintiff could not have
been awarded on a presently existing claim." Id. at 416.

While Plaintiffs claim that DCF's decision to file the
Care and Protection Petition "blocked and sabotaged" their
own emergency guardianship petition in the Franklin County
Probate Court, they do not allege any relief that could not
be obtained in a future suit. In fact, they actually have
already received the relief that they were seeking in that
action before the Franklin County Probate Court -- the
guardianship of their grandson. Additionally, as discussed
more fully above, there is no actual evidence that
Defendants blocked Plaintiffs' ability to petition any
court. Plaintiff Grandparents eventually filed a motion to

intervene in DCF's Care and Protection Petition, filed a
subsequent motion for guardianship, and were eventually
awarded guardianship of their grandson by the Franklin
County Juvenile Court.  In other words, there is no relief
that this court could award under this First Amendment claim
that Defendants blocked Plaintiff Grandparents' access to
the courts, and even if there were, Plaintiffs have not
established any facts that would support a claim that
Defendants blocked their access to the courts in violation
of the First Amendment.

     As this analysis should make plain, Plaintiff
Grandparents' factual allegations against Defendants do not
establish any genuine factual issue as to whether Defendants
violated their rights under the First and Fourteenth
Amendments, and Defendants are therefore entitled to
qualified immunity as to Count V.

G.   Count VI: Violations of Equal Protection

     In Count VI of the Complaint, Plaintiff Grandparents
allege that Defendants violated the Fourteenth Amendment's
Equal Protection Clause by treating them unfairly compared
to others who were similarly situated and by discriminating
against both the grandson because of his "Puerto Rican
heritage" and against Mr. Hootstein because he is male.
Under the Equal Protection Clause, persons who are similarly

45

situated must be provided similar governmental treatment.

See <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432,
439 (1985).

In order to sustain an equal protection claim,
Plaintiffs need to establish that there is a factual issue
as to whether, "compared with others similarly situated,
[they were] selectively treated [unfairly] . . . based on
impermissible considerations such as race, religion, intent
to inhibit or punish the exercise of constitutional rights,
or malicious or bad faith intent to injure a person."
<u>Rubinovitz v. Rogato</u>, 60 F.3d 906, 910 (1st Cir. 1995).
Essential to any § 1983 claim that plaintiffs were denied
equal protection based on racial or gender discrimination is
evidence that the defendants engaged in purposeful
discrimination.  <u>See</u>, <u>e.g.</u>, <u>Personnel Administrator of</u>
<u>Massachusetts v. Feeney</u>, 442 U.S. 256, 272 (1979)
(discussing intent requirement for equal protection claims
in general).

In this case, the complaint does little more than make
conclusory allegations that Defendants discriminated against
Plaintiffs based on the grandson's race and Mr. Hootstein's
gender.  As is true with the other counts in their
complaint, Plaintiff Grandparents fail to specify which of
the individual Defendants were responsible for this

46

invidious discrimination and fail to connect their allegations of constitutional violations with specific facts that would support their claims.  Plaintiffs contend that their equal protection claim is supported by their allegations regarding the commencement of DCF's Care and Protection Petition and the court proceedings that followed and by their assertions that they were forced to undergo intrusive evaluations of their fitness as guardians for their grandson that other similarly situated parties would not have been forced to endure.

As detailed in the sections above, Defendants' decision to initiate the Care and Protection Petition and their conduct in the proceedings that followed was well within the norms established in Mass. Gen. Laws ch. 119, § 24. Although Plaintiff Grandparents may resent not being allowed to control the terms of the proceedings that unfolded once DCF became involved in the guardianship process, they have not come forward with any evidence whatsoever indicating that Defendants acted in a discriminatory fashion.  In the face of a motion for summary judgment, Plaintiffs' mere allegations regarding these proceedings are not sufficient to establish that Defendants violated their rights to equal protection under the Fourteenth Amendment.

In support of their equal protection claims, Plaintiffs

47

also make reference to the fact that Defendant Collins
convened two CRT panels, one to review whether the
grandson's foster/kinship placement with his grandparents
was in the grandson's best interests, and one to review both
whether the grandson should continue to reside with his
grandparents and whether DCF should oppose Plaintiff
Grandparents petition to become his permanent guardians.
However, Defendant Collins, as Area Director, had clear
regulatory authority under 110 Code Mass. Regs. 10.08(2) to
convene the CRTs to review any foster/kinship placements,
and Plaintiffs have produced no evidence that DCF chose not
to use these procedures when considering placements for
other similarly situated parties.  Additionally, though
Plaintiff Grandparents complain that they were not allowed
to participate in these panels, there is no evidence that
DCF's regulations call for such participation or that other
foster parents who were similarly situated were allowed to
have the kind of active role that Plaintiff Grandparents
wished to play in these panels.

Plaintiff Grandparents also argue that DCF's decision
to require that Plaintiff Grandparents undergo the
psychological and other evaluations conducted by Children's
Charter, Inc. before they were allowed either to assume or
retain physical custody of their grandson evidences

Defendants' intent to discriminate against the grandson and
against Mr. Hootstein.  As with Plaintiffs' other
allegations against Defendants, though Plaintiff
Grandparents may have found this process disagreeable, there
is no evidence that DCF's decision to require these
evaluations was the result of any invidious discrimination.
This evaluation was permissible under 110 Mass. Code Regs.
7.104(2), which provides that:

> A foster/pre-adoptive parent applicant or any
> member of her/his household must be free of any
> physical, mental or emotional illness or handicap
> which, in the judgment of the Department, would
> impair his or her ability to assume and carry out
> the responsibilities of a foster/pre-adoptive
> parent.

110 Mass. Code Regs. 7.104(2).  Defendants were therefore
acting well within their regulatory roles when they deemed
that the Children's Charter home study of Plaintiff
Grandparents was necessary in order to satisfy the
requirement that DCF guarantee that Plaintiffs were fit to
serve as their grandson's foster/kinship placement.
Plaintiffs have simply provided no cognizable evidence that
DCF has declined to order such evaluations of other parties
who are similarly situated.[6]  While Plaintiff Grandparents

---

[6] Plaintiff Grandparents' Statement of Undisputed
Material Facts does repeat an allegation that DCF"s
Ombudsman, Kevin Barboaza, told Mr. Hootstein in a telephone
conversation that unspecified "Defendants" were

may have found this process objectionable and unnecessarily
intrusive, this does not constitute proof that the
evaluations violated their constitutional rights.  Thus,
Plaintiffs have failed to offer any evidence that Defendants
violated the Equal Protection Clause of the Fourteenth
Amendment, and Defendants are therefore entitled to
qualified immunity as to the equal protection claim in Count
VI.

H.   <u>Count IV: Allegations of a Conspiracy in Violation of
     42 U.S.C. § 1985(3)</u>

     Count IV of Plaintiffs' Amended Complaint alleges that
unspecified Defendants participated in a conspiracy to
violate Plaintiff Grandparents' civil rights in
contravention of 42 U.S.C. § 1985(3).  The First Circuit has
held that, in order to establish a claim under § 1985(3),
plaintiffs must satisfy four elements: (1) first, plaintiffs
must allege a conspiracy; (2) second, they must allege a
conspiratorial purpose to deprive the plaintiff of the equal
protection of the laws; (3) third, they must identify an
overt act in furtherance of the conspiracy; and (4) finally,
they must show either injury to person or property, or a
deprivation of a constitutionally protected right.  <u>Aulson</u>

---

discriminating against Mr. Hootstein based on his gender,
but no evidence is offered as to who these other parties
were or how the discrimination impacted Plaintiffs.

v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).  Courts have repeatedly emphasized that any claim under § 1985(3) requires "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action."  See Griffin v. Breckenridge, 403 U.S. 88, 102 (1971).

As set out above, Plaintiff Grandparents have failed to come forward with any cognizable evidence of any class-based, invidious discrimination against them.  Thus, they could not possibly succeed in proving that Defendants engaged in a conspiracy to deprive them of their constitutional rights in violation of 42 U.S.C. § 1985(3), and Defendants are therefore entitled to qualified immunity as to the conspiracy claim in Count IV.

I.   Plaintiffs' State Law Claims

The complaint also contains various state law claims, including: (1) that Defendants participated in a criminal conspiracy in violation of Mass. Gen. Laws ch. 265, § 25 (a criminal statute that likely does not provide a basis for any civil claim) (Count I); (2) that Defendants violated Mass. Gen. Laws ch. 119 and various sections of 110 Mass. Code Regs. (Count II); (3) that Defendants' actions violated their rights under the Massachusetts Declaration of Rights (Count VI); (4) that Defendants violated the Massachusetts

Civil Rights Act (Count VII); (5) that Defendants engaged in an abuse of the judicial  process (Count VIII); (6) that Defendants intentionally subjected them to emotional distress (Count IX); (7) that Defendants invaded their privacy in violation of Mass. Gen. Laws ch. 214, § 1B (Count X); (8) that Defendants Molina, Kipp, and Collins defamed them in various court proceedings and DCF meetings (Count XI); and (9) that Defendants violated numerous DCF regulations under 110 Code Mass. Regs. and fair information practices under Mass. Gen. Laws ch. 66A (Count XII). Defendants argue that, if this court grants the motions for summary judgment as to Plaintiffs' federal claims, then it should exercise its discretion to decline supplemental jurisdiction over Plaintiff Grandparents' remaining state law claims.

In a federal question case, a federal court may decide closely related state law claims pursuant to the limits of its supplemental jurisdiction. See 28 U.S.C. § 1367.  The termination of the federal claims in these cases does not, however, necessarily divest the district court of its power to exercise supplemental jurisdiction. Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 256-257 (1st Cir. 1996).  Rather, dismissal of the federal questions merely sets the stage for the court to use its informed discretion

regarding whether it should retain the remaining state law claims.  See 28 U.S.C. § 1367(c)(3) (authorizing a district court to decline adjudication of lingering state-law claims after it has dismissed "all claims over which it has original jurisdiction").  In deciding whether or not to retain jurisdiction, the trial court must "take into account concerns of comity, judicial economy, convenience, fairness, and the like."  Roche, 81 F.3d at 257 (citations omitted). Each case must be decided based on its own particular facts, and the "preferred approach is pragmatic."  Id.

In this case, important considerations of state expertise and judicial comity weigh against this court retaining the remaining state law claims.  After all, it is well-established that state courts have almost exclusive jurisdiction over matters of family law.  This expertise is especially significant given the Supreme Court's admonition that "needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."  United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966).  This court will therefore exercise its discretion and decline jurisdiction over Plaintiffs' causes of action that are based on state law. Thus, Plaintiff Grandparents' remaining state law claims

must be dismissed, without prejudice to their refiling those
claims in state court.

IV.   <u>CONCLUSION</u>

Plaintiffs' sincere sense of grievance comes through
powerfully, both in their counsel's oral and written
arguments and in their own <u>pro</u> <u>se</u> submissions.  Moreover,
the court deeply respects the generous love reflected in
their determination to nurture and protect their grandson.
Nevertheless, it would be false charity to Plaintiffs to
pretend that this federal lawsuit rests on an adequate legal
foundation.  Any outcome favorable to them would quickly be
reversed on appeal.

For the foregoing reasons, Defendants' Motions for
Summary Judgment (Dkt. Nos. 51 & 54) are hereby ALLOWED.  As
noted above, Plaintiffs' state law claims are dismissed,
without prejudice to their refiling in state court.  This
case may now be closed.

It is So Ordered.

                              /s/ Michael A. Ponsor
                              MICHAEL A. PONSOR
                              U. S. District Judge